BLACKWELL, APPELLANT, *v.*
INTERNATIONAL UNION, UNITED AUTO
WORKERS ET AL., APPELLEES.

(No. 44443—Decided February 10, 1983.)

*Ms. Katherine M. Walsh, Mr. James Leo Walsh* and *Mr. Thomas J. Dougan,* for appellant.

*Mr. Eugene Green* and *Mr. Cornelius J. Baasten,* for appellees.

DAY, P.J.  Floyd Blackwell, now deceased,[1] brought this action against the International Union, United Auto Workers ("International"), and the U.A.W. Local 1250 ("Local"). He sought injunctive relief for breach of contract grounded on the failure to provide him with a pension. The trial court dismissed the International as a party and several of the plaintiff's causes of action. These dismissals are not the subject of this appeal.

After a bench trial the court found for the Local holding that no contract existed between Blackwell and the Local for the provision of a pension. The cause of action will be treated as one for declaratory judgment to establish plaintiff's rights under his contract of employment.

Plaintiff assigns three errors and three issues of law. The latter more precisely state the essence of the errors claimed. Therefore, the issues are treated as the assignments.

For the reasons adduced below, the judgment is reversed.

---

[1] Mr. Blackwell died on February 17, 1982. A motion of the administratrix, Ethel Blackwell, to substitute herself as party-plaintiff (plaintiff) was granted September 8, 1982.

## I

In the early 1950's, Floyd Blackwell was an employee of the Ford Motor Company at the Brookpark facility. He was active in bringing the U.A.W. into the plant and was a charter member of the Local. In 1955 he was discharged by Ford for engaging in wildcat strike activity. After briefly working as an administrative assistant for the local, he was hired by then president Al Granakis to work as fulltime custodian for the same entity.

By deposition, Granakis testified that Blackwell was to be on parity with workers doing similar jobs at Ford. His pay and benefits were to be governed by the contract the Local had with Ford. Blackwell was classified a Group I cleaner. Later, his classification was upgraded to Group III cleaner.

The understanding that the terms of Blackwell's employment were governed by the Ford contract was also held by two subsequent Local presidents, Art Kuhns and Thurmon Payne. And Blackwell did receive the same basic wage, vacation, medical benefits, sick pay and holidays as the Ford cleaners. It was the understanding of the three presidents that Blackwell was entitled to pension benefits as well under his employment arrangement.

Evidence was introduced to show the union procedures for the approval of actions taken by officials of the Local. This entailed acceptance by the Executive Board and then ratification by the general membership. But it was Granakis' opinion that formal ratification of the hiring of the Local's employees was only a *pro forma* requirement. Although the minutes of the Executive Board were searched, no record was found of a formal motion passed to authorize Blackwell's employment or his pay increases as each became due under the Ford contract.[2] It seems that Blackwell simply worked under the assumption, shared by at least part of the officers of the Local, that he would receive a pension at retirement.

Both Blackwell and Local officials understood there were problems in the "implementation" of the pension plan. Granakis testified that he thought the benefits would be paid directly from the Local's general fund; that no special fund need be established. Joseph Bors, a Local administrative assistant, testified by deposition that off-the-record discussions of the Executive Board were held at which implementation of the plan was raised but not resolved. After such meetings, Blackwell was reassured that he would receive his pension. Art Kuhns testified that during his presidency in the early 1960's, Blackwell approached him to see about getting his pension funded. Kuhns responded that because of political divisions on the Executive Board, he could only count on two votes and that he therefore could not implement the pension. Finally, in 1978, Blackwell received a letter on official Local 1250 stationery stating that, "This is to remind you that Local 1250, U.A.W. recognizes that you should be covered by a retirement plan."

At the time this lawsuit was filed

---

[2] However, the December 3, 1968 minutes of the Building Corporation were introduced into evidence. These state that:

"Brother K. Jack moved to have the Cost-Of-Living Allowance included into Brother Blackwell's Pension Plan, retroactive to October 31, 1968, and any future C.O.L. increases, seconded by C. Sigler, M/P/U."

The relationship between the Executive Board and the Building Corporation was ambiguous. Although separate entities, they had identical memberships. While Kenneth Jack's testimony concerning the motion confuses a meeting of the Executive Board for that of the Building Corporation, it seems that this motion was ratified by the general membership of the Local. However, one witness thought that the pension plan, mentioned in the motion, in fact referred to a severance fund. There is nothing about the wording in the relevant minute which suggests even obliquely that a severance fund was involved.

Blackwell was sixty-five years old and still working for the Local. He testified that he would have retired earlier had the pension been clearly in place.

## II

As a preliminary matter, the Local raises the argument that since Blackwell had not yet retired when the suit was filed, the cause of action for breach of contract was not mature. This argument is well-taken, but it does not dispose of the case; it merely changes its posture.

Liberally construed, Blackwell's complaint requests both declaratory and injunctive relief. Civ. R. 1(B), 8(F), 57. R.C. 2721.04 specifically permits construction of a contract by declaratory judgment prior to breach. Therefore, this case will be treated as an action for declaratory judgment.

## III

The issues treated as the assignments of error are:

"1. Whether Local 1250 of the U.A.W. must be held liable on the contract for a pension on the theory of Agency by Estoppel.

"2. Whether the evidence at trial proved that officials of Local 1250 of the United Automobile Workers promised to establish a pension plan equivalent to that provided for Group 3 Cleaners in the Ford-U.A.W. Master Contract and Plaintiff-Appellant's continued reliance on those promises constitute a contract between U.A.W. Local 1250 and the Plaintiff-Appellant.

"3. Whether the doctrine of promissory estoppel in Ohio is applicable to promises or representations made by officials of a union in the absence of specific authority in a constitution or by-laws permitting such individuals to make legally-binding promises on behalf of that organization."

## IV

For the purposes of this opinion it may be assumed that Granakis had no express authority under the bylaws and constitution of the Local and the International to hire Blackwell and set the terms of his employment. But actual authority is not the only means by which an agent may bind his principal. The agency may arise by implication or estoppel as well. *Levin v. Nielsen* (1973), 37 Ohio App. 2d 29, 32 [66 O.O.2d 52]. It was, therefore, error for the trial court to rule that simply because union procedure did not permit Local officials to make legally binding promises, there could be no contract between the Local and Blackwell.

Agency by estoppel is grounded on the notion that where the principal clothes the agent with the appearance of authority or knowingly permits the agent to act as though he had such authority, the principal should be bound by acts within the agent's apparent authority upon which third persons rely in good faith. See *Logsdon v. ABCO Constr. Co.* (1956), 103 Ohio App. 233, 241-243 [3 O.O.2d 289]. In this case, Granakis testified that Executive Board ratification of his hiring of Local employees was *pro forma* and dispensable. Thurmon Payne testified that notwithstanding the constitution and bylaws "it was normal practice" for the Local president to hire Local employees. Coupled with the fact that the Local accepted the benefits of the agreement between Granakis and Blackwell, there is sufficient basis[3] in this case to estop the

---

[3] *U.S. Rolling Stock Co.* v. *Atlantic & G.W. RR. Co.* (1878), 34 Ohio St. 450, 463:

"* * * Mere silence has often been held to give rise to a conclusive presumption of ratification, especially where good faith and fair dealing require the principal to speak, and his silence has a tendency to mislead. Story's Agency, § 255.

"It is equally true, and results from the application of the same principle, that if the principal adopts a part of the act of the agent, upon full knowledge of the circumstances, he there-

Local from denying the agency between itself and its officials in the particulars affecting Blackwell and the terms and conditions of his employment.

Blackwell acted in good faith with and for the various Local officials with whom he dealt. Moreover, he exercised reasonable prudence under the circumstances. *Agosto* v. *Leisure World Travel* (1973), 36 Ohio App. 2d 213, 216-217 [65 O.O.2d 339]. He asked for assurances that he had pension rights. And he was given such assurances. Doubt existed only as to implementation. But considering Granakis' view that the pension could be paid out of the general fund, this lack of implementation does not charge Blackwell with any imprudence in his reliance on the agency.

The first assignment of error is well-taken.

### V

The record clearly indicates that Blackwell was repeatedly reassured of his right to a pension. The record is equally clear that this promise was a prime inducement to Blackwell's continued employment. In *Cantor* v. *Berkshire Life Ins. Co.* (1960), 171 Ohio St. 405, 407 [14 O.O.2d 157], the court answered "No" to the question:

"* * * [W]hether the rights of an employee in a non-contributory retirement system established by an employer may be divested by the employer after the employee has fulfilled all the conditions relating to his right to retirement benefits."

The court found that:

"A retirement program has become a basic part of an employee's remuneration even as his wages are a part thereof, and a consideration flows to the employer as well as to the employee through such a program.

"Clearly, under our present economic system, an employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder." *Id.* at 410. Accord *Sheehy* v. *Seilon, Inc.* (1967), 10 Ohio St. 2d 242, 243 [39 O.O.2d 374].

A union is not exceptional. When it acts as a principal-employer its responsibilities are the same as those of any other employer. Blackwell was offered the pension as part of the employment contract. After nearly twenty-five years on the job the Local cannot now withdraw the offer extended through its agent and act as though the contract of employment did not exist.

The second assignment of error is well-taken.

### VI

The doctrine of promissory estoppel aids in the enforcement of promises by , in effect, supplying the essence of consideration where necessary to prevent injustice.[4] The doctrine is recognized in Ohio, Cf. *Talley* v. *Teamsters Local No. 377* (1976), 48 Ohio St. 2d 142, 146 [2 O.O.3d 297]. It intersects with the law of agency when one considers the reasonableness of the reliance of the promisee; see *United Steel Workers* v. *United States Steel Corp.* (N.D. Ohio 1980), 492 F. Supp. 1, 5:

---

by ratifies the whole. He can not elect to take a part and reject the balance. An acceptance of the benefits of the transaction imposes the obligation to assume its burdens and operates to confirm it as a whole."

[4] Restatement of the Law, Contracts 2d (1981) 242, provides at Section 90:

"(1)  A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

"Promissory estoppel * * * is a less rigid concept, being part of the equity powers of the Court. The lack of a technical power of agency in any of the company's spokesmen does not relieve the company from a binding promise if it should reasonably have expected the statements of the spokesmen to be relied upon detrimentally by the workers. This is a more subtle point and requires an examination of the particulars of the statements and a judgment by this Court of the reasonableness of reliance."

The reasonableness of Blackwell's reliance on the agency between the Local and its officials has already been discussed. And, here, the promisor Local — acting through its agents — should reasonably have expected their procrastination in implementation on the one hand, and promises of a "right" on the other, to induce substantial forebearance on Blackwell's part. Blackwell made it evident the hope of a pension kept him on the job. Finally, enforcement of the promise of a pension is the only means of preventing injustice in this case.

The third assignment of error is well-taken.

## VII

The judgment of the court below finding no contract between the Local and the appellant for the provision of a pension according to the terms set out in the Ford-U.A.W. contract is reversed. The cause is remanded for further proceedings according to law.

*Judgment reversed and cause remanded.*

PARRINO and NAHRA, JJ., concur.